UNITED STATES DISTRICT COURT'

SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

JOBPATH PARTNERS, LLC.,

      Plaintiff,

    -against-                    24 civ. 9026 (CM)

CITY OF NEW YORK and
CDW GOVERNMENT SERVICES,

      Defendants

——————————————————————— x

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART THE CITY'S MOTION TO DISMISS; GRANTING CDW-G'S MOTION TO DISMISS; AND GRANTING PLAINTIFF LEAVE TO AMEND[1]

McMahon, J.:

### Background

This dispute arises out of a business relationship between JobPath Partners, LLC

("Plaintiff" or "JobPath") and the City of New York ("City").

Plaintiff JobPath is a software developer which, over the years, has developed a network

of charities and private organizations that use its proprietary software to help veterans and

disabled individuals find employment through a database of available jobs. Compl. ¶¶ 22-24.

JobPath generates revenue by charging fees to employers and organizations that use its software

and access the job database. *Id.* ¶ 24. The City of New York entered into a business relationship

with JobPath in or about 2019 or 2020, whereby JobPath was to create software that would

match veterans with available City jobs. *Id.* ¶¶ 25, 28. This arrangement lasted until 2023, when

the City purported to terminate it. *Id.* ¶ 71. JobPath has sued the City alleging that the City

---

[1] The court issued an order disposing of these motions on September 30, 2025. This decision more fulsomely explains the reasoning behind that order.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/8/25

improperly terminated their contractual relationship. *Id.* ¶ 88. JobPath brings claims under (a) breach of contract; (b) unjust enrichment; (c) New Jersey Computer Related Offenses Act ("CROA"); (d) Federal Computer Fraud and Abuse Act ("CFAA"); and (e) copyright infringement. It has also sued an entity through whom the City sometimes contracts for IT services, CDW Government LLC ("CDW-G"), for breach of contract and unjust enrichment.[2] Both Defendants have moved to dismiss the complaint.

The City's motion to dismiss is granted in part and denied in part. CDW-G's motion to dismiss is granted in its entirety.

### A. The City, CDW-G, and the Plaintiff's Business Relationship Formation

The following facts are taken from the complaint, and except as otherwise noted are presumed to be true for purposes of these motions.

The business relationship between the City of New York and JobPath began in 2019, when the City expressed interest in having JobPath adapt its proprietary software to the City's particular needs, so as to facilitate matching veterans to City jobs. Compl. ¶ 25. The City wanted JobPath to develop virtual "skins" that would sit on top of its native interface, giving users the impression that the jobs portal was provided by the City. *Id.* ¶ 26. This new City-connected version of JobPath's software was to be called VetConnectPro. *Id.* ¶ 27.

The first pleaded communication between Plaintiff and the City took place on April 7, 2020.[3] *Id.* ¶ 28. On that date, Jack Fanous, CEO and Co-Founder of JobPath, emailed what Plaintiff describes as an "offer letter" to Jason Loughran, Executive Director of Special Projects

---

[2] Plaintiff originally named Betis Direct, LLC—a City certified Minority Women-Owned Business Enterprise ("MWBE")—as an additional Defendant but had since discontinued the claim against it. Dkt. No. 47.

[3] Aside from the mention that the relationship began in 2019, the complaint contains no information about any discussions or negotiations that occurred prior to April 7, 2020. Plaintiff's Memorandum of Law states, "[C]ontract negotiations had reached the stage where JobPath sent [the offer letter]," Dkt. No. 44 at 5, but there is nothing in the pleading about what went on during those negotiations.

of the New York City Department of Veteran's Services ("NYCDVS" or "DVS"). Compl. ¶ 28,

Ex. A. In the "offer letter", JobPath described its software development capabilities, specifically

highlighting its military skills translator and matching tool, along with a skills assessment,

custom resume builder, and career mentorship portal. *Id.* The "offer letter" does not contain any

explicit offer to provide these or any other specific services to the City. However, it does set out

one condition that JobPath insisted was necessary before it would provide *any* services to the

City:

> *These services can only be made available to New York City by JobPath via an executed*
> *contract.* Each of these features is the sole and exclusive property of JobPath, and cannot
> be licensed, sublicensed, sold, transferred, leased, subleased, merge [sic], pledged, or
> packaged in any way except by JobPath Partners LLC.

Compl. Ex. A. (Emphasis added). No form of contract or contract proposal was attached to the

"offer letter" email. The email itself is so barren of detail – no information about what exactly

what services were be provided (as opposed to describing what services JobPath could provide),

no price, no term – that the "offer letter" could not possibly constitute a contract, or even an offer

to contract that could be accepted.

  And indeed, Plaintiff does not allege that the "offer letter" was the contract. Rather,

Plaintiff alleges that the City entered into a contract with it in two different ways.

  First, JobPath contends that the "offer letter" placed the City "on notice" that use of its

software would constitute the City's acceptance of JobPath's Licensing Agreement – a 36 page

long formal contract that includes clauses on intellectual property ownership, duration, price, and

cancellation, among other things. Compl. ¶¶ 29, 36, Ex. L. If this is an allegation of fact, it is not

plausible; if a legal conclusion, it is just plain wrong. The Licensing Agreement is not even

mentioned in the "offer letter" email, let alone attached to it. The "offer letter" did not put the

City "on notice" of the existence of that document, or of any of its terms and conditions. In fact,

3

the complaint does not plead any facts about when the City first became aware that JobPath had created a form Licensing Agreement. It does allege that the Licensing Agreement was not sent to the City until February 10, 2021 – almost a year after the "offer letter" email was sent. Compl. ¶ 61, Ex. L.

Moreover, contrary to JobPath's contention, the email does not say that use of JobPath's software was conditioned on acceptance of *the Licensing Agreement*. The email says only that JobPath would not provide the City with any of its services without having an "executed contract." Compl. Ex. A.

Finally, while JobPath calls the April 7 email an "offer letter," it is not, as I have already held, an offer to provide specific services at a specific price over a specific term. It is an explanation of what JobPath was capable of doing and an announcement that JobPath expected the parties to enter into a written and signed (executed) agreement if the DVS wishes to do business with JobPath.

In short, there is not a single plausible allegation in the complaint that could be interpreted as constituting acceptance by the City to the Licensing Agreement drafted by JobPath.

However, Plaintiff also alleges that a contract was formed in another manner.

Specifically, JobPath alleges that the City accepted its April 7, 2020 "offer" by subsequently requesting that Plaintiff supply it with the goods and services described therein n on multiple occasions. Compl. ¶ 89. If (as it literally says) this paragraph in the complaint is interpreted as alleging that the City agreed to execute the *Licensing Agreement* by asking JobPath to provide it with goods and services, the allegation fails. This is because no facts are pleaded that would tend to lead one to that conclusion. When the first such "request" for services

4

(i.e., purchase order) was issued (on December 14, 2020), the City still had not seen a copy of JobPath's Licensing Agreement (which it did not receive until February 10, 2021). Any argument that Paragraph 89 alleges that the City was agreeing to the Licensing Agreement by ordering services from JobPath is simply not plausible.

However, if Paragraph 89, viewed most favorably to the pleading party, alleges that a contract of some sort was formed by the City's request for services – that the City did indeed ask for and obtain services from JobPath – then we are on an entirely different footing, because the complaint certainly pleads facts from which one could plausibly draw that conclusion. Here are the relevant facts as alleged in the complaint:

On May 18, 2020 – a month after the "offer letter" email was sent – Fanous sent JobPath quote number 501 ("Quote 501") to Tom Lyons, Senior Sales Manager at a city-certified minority women-owned business enterprise (MWBE) called Betis. The Quote was sent to Betis rather than directly to the City at the request of DVS (i.e., the City). *Id.* ¶ 30, Ex. B. There is no allegation that Betis was intended to provide any software services to the City as part of the arrangement between DVS and JobPath; rather, Plaintiff alleges, upon information and belief, that the City uses Betis for the purpose of creating the illusion that its arrangement with JobPath was with a minority-owned business, which JobPath was not. *Id.* ¶ 32.

Unlike the April 7 so-called "offer letter," Quote 501 actually could constitute an offer by JobPath to enter into a business relationship with the City on stated terms. *See RBC Aircraft Products, Inc. v. Precise Machining & Mfg. LLC*, 630 Fed. Appx. 11 (2d Cir. 2015) (recognizing seller's price quote could have constituted an offer but for evidence that buyer was firmly against a long-term agreement); *Tokio Marine and Fire Ins. Co., Ltd. v. Federal Marine Terminal, Inc.*, 397 F.Supp.2d 530, 535 (S.D.N.Y. 2005) (denying summary judgment because plaintiff's "rate

quote" sent to defendant raises an issue of fact as to whether there was an offer); *CBS, Inc. v. Auburn Plastics, Inc.* 67 A.D.2d 811, 812 (App. Div. 4th Dep't 1979) ("[T]he [price] quotations were sufficiently detailed and specific so as to constitute offers.");1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.10, at 237 (2d ed. 1998) ("A basic rule of contracts holds that whether an offer has been made depends on the objective reasonableness of the alleged offeree's belief that the . . . solicitation was intended as an offer."). Unlike in *Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.*, 553 Fed.Appx. 37, 40 (2d Cir. 2014), the services to be provided pursuant to Quote 501 were not "irredeemably vague and undefined," especially in the context of the parties' prior communications. The quote indicates that JobPath was offering to provide the City with a software license and development support for a term of five years, at an annual rate of $242,500, for a total of $1,212,500. Compl. ¶ 35, Ex. B. The amount to be paid to JobPath was separately stated for each year. Compl. Ex. B. Notably, Quote 501 was sent *at the request* of NYCDVS, Compl. ¶ 30, providing for "objective reasonableness" that the City would perceive the quote to serve an offer. "[T]he court can look to the surrounding facts and circumstances to determine the intent of the parties." *67 Wall St. Co. v. Franklin Nat. Bank*, 37 N.Y.2d 245, 918 (1975).

But just as significantly, the Licensing Agreement was not attached to the quote, and neither it nor its extensive terms were incorporated into or referenced in Quote 501. Compl. Ex. B.

Three days after Quote 501 was sent, Plaintiff first became aware that there would be a second intermediary (in addition to Betis, the MWBE) involved in its dealing with the City. On May 21, 2020, Ryan Colt, Senior Account Manager of Defendant CDW-G, sent an email to Fanous and others, announcing that CDW-G would serve as a "conduit" between Plaintiff and City, although JobPath would be the actual service provider. Compl. ¶ 37, Ex. C. The complaint

does not plead any facts explaining why any such intermediary was necessary. However, in its

motion to dismiss, the City introduces into the record (improperly) the fact that it had a "Master

Agreement" (Contract Number 20191200196, dated July 26, 2018) with CDW-G, pursuant to

which CDW-G was obligated to purchase software and computer hardware from third parties for

use by the City. Dkt. No. 34-1 at 4, Ex. 2. In effect, CDW-G had a contract to act as the City's

purchasing agent for IT-related products and services. Plaintiff is not a party to the Master

Agreement, and no facts are pleaded in the complaint tending to show that JobPath was aware of

the Master Agreement.[4]

> Colt's email states, in relevant part:
>
> To a small degree we have nipped annual milestones in the butt by taking the 5 year
> contract and breaking down into annual payments that will be quoted each year, and paid
> each year by DVS [the City]; vs quoting the full 5 years upfront.
>
> $250,000 Flat Licensing Fee due per year for 5 years. Annual Fee is to obtain License to
> use JobPath's Intellectual Property . . ."

Compl. Ex. C. This email appears to confirm that the City (through CDW-G) had agreed to

license JobPath's software for a term of five years, for a fee of $250,000 per year.[5]

On May 30, 2020, Loughran sent Fanous a schedule setting out Plaintiff's deliverables.

Compl. ¶ 38, Ex. D. The timeline sets out exactly what JobPath was expected to do between June

1 and November 11, 2020 (Veterans Day) – the date on which the City planned to announce that

---

[4] Plaintiff does not rely on the Master Agreement, which is not surprising, since Plaintiff is not a party to the Master
Agreement and does not contend that it is. As a result, the Complaint pleads virtually nothing about the Master
Agreement, except that it was referenced in the City's termination of its arrangement with JobPath. Its existence
appears to arise as a defense by the City to the claims asserted. It thus cannot be considered on a motion to dismiss.
*Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 152-53 (2d Cir. 2002). The Master Agreement is mentioned in this
decision only to explain the involvement of CDW-G as the City's purchasing agent – an explanation that is
conspicuously missing from the pleading itself, albeit for understandable reasons.

[5] The Complaint does not explain why the contract amount increased from $242,500 (in Quote 501) to $250,000 (in
all subsequent communications). The court infers that the difference is attributable to commissions taken off the top
by Betis and CDW-G – the idea being that JobPath would net $242,500. Support for this inference can be found at
n.8, *infra.*

JobPath platform, known as "NYC VetSuccess Square", to a waiting world. Compl. Ex. D. The timeline included target dates for approval of the arrangement between JobPath and the City by OMB (was supposed to occur by June 22), accessibility testing (during July) and training of NYCDVS personnel (August through October). The Complaint does not plead whether JobPath performed any of those services during the time periods in the May 30 email schedule.

What is clear is that there was no executed contract between the City and JobPath during the period encompassed by the May 30 schedule. In a June 11, 2020 e-mail from Colt to Loughran and others, Colt contacted City's Mayor's Office of Management and Budget (OMB) to check on the progress of approving DVS's proposed relationship with JobPath. Compl. ¶ 39, Ex. E. OMB's role with City contracts is to ensure "that the Administration's priorities are funded and implemented efficiently and effectively . . ." New York City OMB Mission Statement, www.nyc.gov/site/omb/about/mission-statement.page (last visited Sept. 29, 2025). Insofar as is relevant to this case, it appears the City would not issue a purchase order for JobPath's services first obtaining OMB approval. However, nothing about OMB's role is pleaded in the Complaint.

There was no response to Colt's email for over two months. On August 12, 2020, Glenda Garcia, General Counsel of NYCDVS, finally replied, "The contract is still pending with OMB." Compl. ¶ 40, Ex. F.[6] Whatever contract OMB was reviewing during the summer of 2020, it could not have been the Licensing Agreement, because the City did not yet have a copy of that document – and would not receive one for another six months. Compl. ¶ 61.

---

[6] The delay could plausibly be explained by the fact that all this was taking place at the height of the COVID epidemic – Garcia's August 12, 2020 email indicated that "COVID-related purchases are taking precedence over these types of contracts." Compl. ¶ Ex. F. But this remains to be explored during discovery.

One would have expected that nothing happened while the situation with OMB was in limbo. But things did go on during those months – unsavory things that, according to Plaintiff, explain the delay in responding to Colt's email and finalizing the City's relationship with JobPath.

On July 7, 2020, Plaintiff alleges that James Hendon, Commissioner of NYCDVS, called Fanous and demanded that Fanous's charitable organization, GI Go Fund, donate $100,000.00 to something called the Mayor's Fund to Advance the City of New York ("the Mayor's Fund"). Compl. ¶¶ 42-43. On July 8, 2020 – the very next day – Plaintiff alleges that Commissioner Hendon repeated the same demand to Fanous and JobPath partner Justin Constantine. *Id.* ¶ 47. Commissioner Hendon allegedly threatened that GI Go Fund and its members would be investigated unless the contribution was received. *Id.* ¶ 44.

Fanous reached out to NYCDVS to ask about this demand. *Id.* ¶ 46. NYCDVS assured Fanous that Commissioner Hendon was not acting on behalf of NYCDVS in asking for the donation. *Id.* Plaintiff refused to make the "requested" donation. *Id.* ¶ 41. Plaintiff alleges, on information and belief, that this is what caused the delay in OMB's approving JobPath's relationship with the City. *Id.*

Plaintiff further alleges that the failure of JobPath to give in to Hendon's extortion resulted in the City's decision to decrease the annual licensing fee on which the parties had previously agreed. *Id.* ¶ 56. As noted above, earlier emails, including one from Colt at CDW-G, indicated that the City was amenable to accepting JobPath's offer to provide its software services for a fee of $250,000 per year (net of commissions) for five years. However, on November 16, 2020, Glenda Garcia emailed Fanous and Colt, advising them the City would only pay a licensing fee of $150,000 – not $250,000 the figure Colt had confirmed in his email of May 21 –

9

during the first two years of the contract. Compl. ¶ 55, Ex. I. Although the City told JobPath that the reduction was dictated by budget constraints, Compl. ¶ 58, Plaintiff alleges the price reduction was retaliation for Plaintiff's refusal to make the "requested" contribution to the Mayor's Fund. *Id.* ¶ 56.

Nonetheless, JobPath must have wanted the City's business, because it acquiesced in the price reduction. *Id.* ¶ 59. Plaintiff sent an e-mail with its revised statement of work (effectively a revision of Quote 501) to NYCDVS on November 23, 2020. Compl. ¶ 60, Ex. K. The new statement of work (NYC DS White Label) states, in relevant part:

> **Annual Fees**
>
> $250,000 Flat Licensing Fee due per year for 5 years
>
> Flat Licensing Fee will be reduced to $150,000 for years 1 and 2 to meet city funding restraints.
>
> Annual Fee is to obtain License to use JobPath's Intellectual Property, including the features listed below:

Compl. Ex. K. Listed below the fee and term provisions in the revised statement of work are the specific features that JobPath agrees to license and the support services it agrees to provide in exchange for the Annual Fees. *Id.* The revised statement of work did not mention the Licensing Agreement or attach a copy of that agreement. Nor did it contain any provision allowing for termination of the arrangement prior to the end of the five year period. There was nothing in this statement of work about termination at all.

The revised statement of work was obviously acceptable to the City because, on December 14, 2020, the City submitted purchase order #20212003511. Compl. Ex. I. The vendor listed on the purchase order was CDW-G, the intermediary purchasing agent – not JobPath. *Id.*[7]

---

[7] There are two Exhibit I's to the Complaint. One is Garcia's November 16, 2020 email; the other is purchase order #20212993511.

However, just as Colt's original email had stated, the actual provider of services was to be JobPath; the body of the purchase order references the provision of a software license and adjunct services. It was the first request for the provision of services from the City to JobPath – the "actual service provider." There is no indication on the purchase order that CDW-G was to provide the City with anything of value in exchange for payment under the purchase order, only that JobPath was to do so.

Commissioner Hendon signed the purchase order under the section labeled Certificate of Necessity. *Id.* The description reads "Year 1 Electronic distribution – NO Media." *Id.* The listed unit price is $150,000 – the amount ultimately agreed upon between NYCDVS and JobPath for the first year of their five-year deal. *Id.*

At this point in time, the City still had not received a copy of, let alone agreed to, JobPath's Licensing Agreement.

Although the complaint does not include any details about whether or how JobPath performed under its agreement with the City, it must have done so, because the complaint alleges that JobPath was paid for the first three years of service shortly after the exchange recited above. Compl. ¶94. Details about the payment are conspicuously lacking, but *dehors* the complaint is a record reference indicating that, on February 3, 2021, Betis (the MWBE intermediary) – not the City of New York – issued a check to JobPath Partners, LLC in the amount of $147,000.[8] Betis Direct Answer, Ex. A.

---

[8] The only plausible inference once can draw is that the City paid Betis, the MWBE that was not otherwise involved in providing any software to DVS. The $147,000 figure reflected in the check is net of a commission received by Betis (for allowing CDW-G to use its MWBE status, so that it would appear that this was a minority contract when in fact it was not) and by CDW-G (for processing paperwork, presumably pursuant to the Master Agreement). Discovery will reveal whether there was anything unsavory about this rather unusual arrangement.

11

These allegations of fact, which I am assuming to be true, plausibly suggest that the City entered into a contract with JobPath for the purchase of software and related services for a term of five years at a stated price. The terms of the contract were memorialized in a series of emails, with the final offer reflected in the revised statement of work dated November 23, 2020 – a statement of work in which JobPath agreed to the proposed price modification in Garcia's email of November 16, 2020. Acceptance by the City of this revised offer is evidenced by issuance of the first purchase order and payment; acceptance by JobPath is evidenced by its performance. If there is a contract between JobPath and the City, this is how it was formed. And JobPath's Licensing Agreement is no part of any such contract.[9]

It was not until February 10, 2021, that Fanous sent an email to Loughran, Executive Director of Special Projects for NYCDVS, attaching a copy of Plaintiff's unsigned and undated Licensing Agreement. Compl. ¶ 61, Ex. L. Apparently Loughran asked for a copy of this document, although the complaint does not explain when or how he learned of it or why he asked for it. *Id.* As noted above, this appears to be the first time that the Plaintiff sent the Licensing Agreement – the document to which it contends the City agreed almost a year earlier – to anyone at the City. The complaint does not allege that the Licensing Agreement was ever executed by either party.

But performance continued, notwithstanding the fact that the Licensing Agreement simply disappears from the story. In addition to the first payment described above, JobPath was paid (by someone) for Years 2 and 3 – which, per the terms of the revised statement of work,

---

[9] JobPath does assert in its reply papers on CDW-G's motion to dismiss that it may have had a "subcontract" with CDW-G in light of the existence of the Master Agreement, of which it was unaware at all relevant times. Dkt. No. 43 at 7. The corresponding allegation in the Complaint can be found at Paragraph 129. This allegation does not identify or attach any "subcontract" or agreement of any sort between CDW-G and JobPath. The Purchase Order is between CDW-G and the City – while Job Path is identified as the source of the software, it is most conspicuously not a party to the Purchase Order.

would have been $150,000 for Year 2 and $250,000 for Year 3. Compl. ¶ 94. JobPath does not allege that anyone breached any contract with it during the first three years.

### B. The investigation into Commissioner Hendon

Sometime in the fall of 2021, New York City Department of Investigations ("DOI") contacted Fanous in connection with an investigation it had opened into Commissioner Hendon. *Id.* ¶ 64.

Starting on October 10, 2021, Hendon repeatedly reached out to Fanous with requests that Fanous speak with Hendon's personal attorney. *Id.* ¶ 65. Fanous did not respond to said inquiries. *Id.* ¶ 66

On October 25, 2021, Plaintiff alleges that Hendon asked Fanous whether there was anything JobPath did "out of the kindness of [their] hearts" that would warrant the payment of additional fees to JobPath. *Id.* ¶ 67. Fanous rebuffed the Commissioner, because he believed the solicitation to be an attempt to bribe him in exchange for his cooperation with any potential legal issues facing Commissioner Hendon. *Id.* ¶ 68.

On May 18, 2022, the City of New York Conflicts of Interest Board ("COIB") issued a public warning letter to Commissioner Hendon, finding that his conduct on July 8, 2020 violated COIB Rule § 1-14(a), which prohibits City employees from soliciting donations from individuals or firms that have a particular matter pending before them. Compl. ¶ 48, Ex. G.

### C. Termination

On December 1, 2023, the City purported to terminate its relationship with the Plaintiff. Compl. ¶ 70-71, Ex. N. The termination letter was sent, not to JobPath, but to CDW-G, in the person of Colt. The letter, sent by Commissioner Hendon, reads as follows:

Dear Mr. Colt,

Due to difficult budget cuts, we are hereby providing notice that DVS's purchase order for JobPath's services is hereby terminated for convenience in accordance with section 2.2 of the [Master Agreement], between CDW-G and the City of New York, effective December 31, 2023. All licenses issued to DVS for the JobPath site shall be relinquished on or before that date. DVS submitted payment of $250,000.00 (two-hundred and fifty thousand dollars) on April 6, 2023, for services rendered and covered the subscription from January to December 2023, which shall be its final payment. The last annual invoice for Year 3 of services, which has been paid, is attached for your reference.

This termination does not affect any other portion of CDW-G's contract with the City. We thank you for your partnership and supporting our commitment to the Veteran community.

Compl. Ex. N. The text of this termination letter mentions a "Master Agreement" between CDW-G and the City (not JobPath). There is no allegation in the Complaint that JobPath was party to any Master Agreement (see n.4, *supra.*). Paragraph 129 alleges – in the alternative to the allegation that JobPath had a contract with the City -- that JobPath had an agreement with CDW-G (which is describes as a "subcontract" in its brief, see n.9, infra.). But the complaint alleges no facts that identify any such agreement.

Because JobPath does not rely on the Master Agreement in its pleading or assert that it creates any sort of business relationship between it and the City, it is not properly considered on the City's motion to dismiss.[10] However, the following information, which I have gleaned from the record, helps complete the story.

As noted above, the Master Agreement appears to have made CDW-G the City's purchasing agent for IT services. The City contends in its motion to dismiss that it terminated the

---

[10] On a motion to dismiss, a court may only consider the text of written instruments if they are "attached [to the complaint] or any statements or document incorporated in it by reference. *Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 152-53 (2d Cir. 2002). The Master Agreement was not attached to the complaint; it was not quoted in the complaint and it was not incorporated by reference into the complaint. It is mentioned in Counts VI and VII as existing between the City and CDW-G. As far as the Complaint is concerned, it is an agreement between the City and someone else to which Plaintiff is not a party.

arrangement between DVS (which is to say, the City) and JobPath pursuant to Section 2.2 of the

Master Agreement.[11] That provision reads as follows:

> Termination. The City will have sole discretion to terminate *this Agreement*, at any time for its inconvenience, upon thirty (3) days written notice to the Contractor. This Agreement may also be terminated at any time with the mutual, written consent of the Parties.

Dkt. No. 34-1 at 4, Ex. 2, § 2.2. (Emphasis added).

This provision does not seem relevant to the current dispute. This sentence of the Master

Agreement addresses only termination of the Master Agreement ("this Agreement") between the

City and "Contractor" – which is the term used in the Master Agreement to identify CDW-G (not

JobPath). The purchase order(s) pursuant to which the City purchased software services from

JobPath are not "this Agreement." Section 2.2 of the Master Agreement says nothing about

terminating agreements with parties other than CDW-G for the purchase of anything; nor does it

say anything about terminating "purchase orders" placed pursuant to the Master Agreement.[12]

Plaintiff was not a party to the Master Agreement between the City and CDW-G, so this

provision does not unambiguously authorize the termination of any contractual arrangement that

might exist between JobPath and the City of New York. Certainly on a motion to dismiss, one

cannot read this provision as authorizing termination of any contract that existed between the

City and JobPath – and Plaintiff alleges that such a contract existed. As far as Plaintiff is

concerned, it had a five year contract with the City that contained no termination provision, and

---

[11] Interestingly, the Master Agreement supposedly expired by its terms in August 15, 2023 – four months before the City purported to terminate the JobPath purchase order. The Master Agreement does provide for the possibility of an extension, but whether it had been properly extended, and so whether the Master Agreement was in effect in December 2023, is just one of the many interesting facets of this middleman purchasing arrangement that will need to be explored during discovery.

[12] The plaintiff does not allege that any purchase orders were "terminated;" fairly read, the Complaint alleges that the City failed to submit purchase orders during the last two years of the five year contract term. Since every agreement and potential agreement is ambiguous on every salient point, this case, assuming proper repleading, will not be amenable to dismissal or summary judgment.

15

that either (1) has not been terminated or (2) was wrongfully terminated – in either event placing the City in breach for failure to pay JobPath for Years 4 and 5.

Plaintiff further alleges that, notwithstanding the fact that the termination notice says that all licenses issued to NYCDVS for the JobPath site shall be "relinquished" by December 31, 2023, the City continued to use its proprietary software on the VetConnectPro site after the purported "termination" – and uses that software even until today. Compl. ¶¶ 80-81, 83. Plaintiff claims it cannot unilaterally cut off the City's access to its software, because doing so would temporarily cut off other users' access, which Plaintiff argues would cause irreparable harm to its brand and its customer relations. *Id.* ¶¶ 85-86. This obviously remains to be explored during discovery on the issue of mitigation of damages.

**Legal Standard**

Both Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos 34-4; 36. Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." In assessing a Rule 12(b)(6) motion to dismiss, the Court is required to accept all material facts alleged in a complaint as true, and to draw all reasonable inferences from its allegations in the plaintiff's favor. *Wharton v. Duke Realty, LLP,* 467 F. Supp.2d 381, 386-87 (S.D.N.Y. 2006). The court is, however, limited to the facts stated in the complaint or in documents attached to the complaint. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

"To survive a motion to dismiss under Rule 12(b)(6) . . . a complaint must contain sufficient factual matter accepted as true, to state a claim to relief that is plausible on its face." *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp.2d 381, 389 (S.D.N.Y. 2011) (citing *Ashcroft v.*

16

*Iqbal*, 556 U.S. 662, 677 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to the assumption of truth. *Iqbal*, 556 U.S. A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 677-78, (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007)). "A plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Unless the well-pleaded allegations have "nudged [plaintiff's] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

In considering a motion to dismiss for failure to state a claim, "[A] district court must confine itself to the four corners of the complaint when deciding a motion to dismiss under Rule 12(b)(6). Kramer, 937 at 767, 773; *see also Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir. 1996) (holding the district court improperly relied upon information *outside* of the four corners of [plaintiff's] complaint) (emphasis added); *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("[C]onsideration of a motion to dismiss under Rule 12(b)(6) is limited to the consideration of the complaint itself.").This means that facts outside of those pleaded in the complaint that constitute defenses are not properly considered on a motion to dismiss. The only defense that will be considered at this state is that the facts pleaded by the plaintiff do not state a claim for relief as a matter of law – not any fact-based defense asserted by

a defendant. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citing *Conley v. Gibson*, 355 U.S. 41 (1957)).

**Discussion**

### A. The City's Motion to Dismiss is Granted in Part and Denied in Part

#### a. The City's Motion to Dismiss Count I – Breach of Contract – is Granted Without Prejudice and with Leave to Replead

Plaintiff alleges that the City breached the Licensing Agreement by failing to pay for the final two years of service and has since continued to use JobPath's software and intellectual property. Compl. ¶ 97. The Complaint quite specifically identifies the contract that was breached as the Licensing Agreement. *Id.* ¶ 88. The City argues that this claim must be dismissed because the City Comptroller never registered the Licensing Agreement, as required by the New York City Charter (the "Charter"), which renders the contract either void or voidable (not clear which). Dkt. No. 34-4 at 6. Plaintiff argues it was the City – particularly Commissioner Hendon's unsavory solicitations – itself that caused the City not to perform its obligation to register the Agreement, so the lack of registration is of no moment. Dkt. No. 44. at 12-13.

The short answer is that none of that is relevant. On the facts pleaded, the Licensing Agreement is not the contract between JobPath and the City of New York as a matter of law, whether it was registered or not. Therefore, the First Cause of Action as presently pleaded must be dismissed.

Under New York law, the essential elements of an action for breach of contract are: (1) formation of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F.Supp.2d 246, 260 (S.D.N.Y. 2002).

On the facts pleaded in the Complaint, the Licensing Agreement is clearly not a contract between the Plaintiff and the City. The Licensing Agreement was never executed by either party. It was not even shown to the City until months after the City and Plaintiff agreed to essential terms and JobPath began providing the City with services pursuant to duly-issued purchase orders. The allegation in the complaint that the "offer letter" somehow put the City "on notice" that JobPath would only provide services pursuant to an "executed" version of the Licensing Agreement is not only not plausible – it is utter nonsense. As outlined above, the "offer letter" contains no offer, and it does not so much as mention the Licensing Agreement, let alone give any "notice" that JobPath would not provide the City with any services unless the City executed the undisclosed Licensing Agreement. The April 7 email does say that JobPath would only agree to offer services pursuant to an "executed agreement," but it does not identify any particular agreement that JobPath would require the City to sign. And the April 7 email was not signed or assented to by the City – the party alleged to be somehow bound by it. The email is simply a document created by JobPath. No fact is pleaded tending to show that the City ever agreed to be bound by it.

In short, the plain text of the "offer letter" as pleaded in the Complaint, Compl. ¶ 28, Ex. A, gives the lie to any suggestion that it can bear the interpretation Plaintiff places on it. The contention that the April 7 email bound the City to the Licensing Agreement at is not a well-pleaded allegation – it is implausible as a matter of fact, and it is untenable as a matter of law. The City's motion to dismiss the First Cause of Action as pleaded is well taken, and it is granted.

But the motion to dismiss JobPath's breach of contract claim against the City must be granted without prejudice. This is because, as outlined extensively above, the Complaint pleads facts that, if proved, tend to show that the City and JobPath entered into a valid and enforceable

contract – one that does not rely on the so-called "offer letter" or the Licensing Agreement for its force.

Under this alternative theory of contract formation, the actual "offer" to provide services is found, not in the "offer letter," but in Quote 50, which was solicited by the City from JobPath. Compl. Ex. B. That quote identifies the services to be provided (a software license and support), a price ($242,000 per year) and a term (five years) – the basic requisites of a contract. *See Foros Advisors LLC v. Digital Globe, Inc.*, 333 F.Supp.3d 354, 361 (S.D.N.Y. 2018); *Hudson Technologies, Inc. v. RGAS*, LLC, 716 F.Supp.3d 327, 333 (S.D.N.Y. 2024) (recognizing "quantities" and "prices" as essential terms); *Cambridge Valley Machining Inc. v. Hudson MFG LLC*, 470 F.Supp.3d 230, 255 (N.D.N.Y. 2020). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Lamda Solutions Cop. v. HSBC Bank USA, N.A.*, 574 F.Supp.3d 205, 214 (S.D.N.Y. 2021) (quoting Restatement (Second) of Contracts § 24 (1981)). Intermediate emails suggest that there was continued negotiation, especially over the price – the City ultimately lowered its offer to $150,000 for the first two years and $250,000 for the next three years – but JobPath submitted a revised scope of work document accepting the two year price reduction, and the City accepted JobPath's revised offer by commencing performance. It issued a purchase order (albeit one addressed to CDW-G) for JobPath's services for the first year, accepted the services JobPath performed pursuant to this arrangement for three years, and paid JobPath for those services though Betis, a dummy intermediary MBWE that provided the City with no software services at all.

These pleaded facts, if proven, would at least theoretically establish the existence of a contract for JobPath's provision of services to the City for a term of five years at a stated price.

Were the plaintiff to file an amended complaint pleading this, rather than the "offer letter" and the unexecuted Licensing Agreement, as the contract that was breached, I could hardly dismiss the claim for breach of contract on motion – because plaintiff would then plausibly allege the existence of a contract, its performance, and the City's breach by its premature termination.

The City insists that the contract was terminated because it purchased the software license and adjunct services provided by JobPath, not directly from JobPath, but rather from CDW-G pursuant to the Master Agreement. Dkt. 34-4 at 1 ("JobPath entered into an agreement with [CDW-G] to provide a City-branded 'skin' of a website . . . in connection with a master contract and purchase order between CDW-G and the City."). That may or may not be true. But assuming that the Plaintiff were to plead a plausible theory of contract formation (and on the facts alleged it certainly can plead such a theory), the City's purely fact-based defense that its agreement was really with CDW-G could not  be considered on a motion to dismiss. The plaintiff is master of its complaint, and the complaint pleads that JobPath and the City reached an agreement between themselves, albeit with the assistance of an intermediary (CDW-G). There is no allegation in the Complaint that JobPath was party to any Master Agreement, or to any identified agreement with CDW-G. Nor is there any allegation that the City's decision to make the purchase from JobPath through an intermediary purchasing agent had any impact on the existence of the alleged contract between JobPath and the City. The City can of course assert as a defense its argument that it had no contract with anyone but CDW-G – but that is not a defense that would defeat a properly pleaded claim for breach of contract, because there are simply too many contested facts that would need to be explored and resolved. It may be that CDW-G was something more, or that JobPath was aware of limitations placed on its situation by the existence of the Master Agreement – but on a motion to dismiss, none of that is relevant. The City's

21

insistence that the only contract here was between it and CDW-G does not make that statement true – any more than the City's running its payment to JobPath through Betis transforms its arrangement with JobPath into a true contract with a business owned by minority women.

But we are not yet at that moment. In its pleading the Plaintiff has elected to tie its complaint of breach of contract specifically to the Licensing Agreement. That dog won't hunt. If the Plaintiff wishes to pursue a breach of contract claim against the City, it must replead that claim in a plausible manner.

Because there is no plausible basis to assert that the City ever agreed to the specific Licensing Agreement on which JobPath relies, its argument that the Licensing Agreement is invalid and/or unenforceable for failure to have it registered with the Comptroller is irrelevant. However, in the event that the Plaintiff decides to replead its breach of contract claim, I note that there is a flaw with considering this argument on a motion to dismiss as well.

[M]unicipal contracts which violate express statutory provisions are invalid." *Granada Buildings, Inc. v. Kingston*, 58 N.Y.2d 705, 708 (1982). Chapter 13 of the Charter, Section 328(a) states, "No contract or agreement executed pursuant to this charter or other law shall be implemented until (1) a copy has been filed with the comptroller and (2) *either* the comptroller has registered it or thirty days have elapsed from the date of filing . . ." *Id.* at § 328(a) (emphasis added); *See also Defoe Corp. v. New York City DOT*, 87 N.Y.3d 754, 761 (1996) (holding that even after an agency awards a contract, "such contract is not effective until it has been registered.").

As was the case with the Master Agreement, this issue raises a fact-based defense that cannot be established without evidence that it would be improper to consider on a motion to dismiss. Facts are pleaded tending to show that OMB was indeed made aware of the "JobPath

contract." Whether that qualifies as "filing" is not something that could be resolved on a motion to dismiss; it would require discovery. If the City's position that its only contract was the Master Agreement between it and CDW-G is correct, there is no suggestion in the City's papers that the Master Agreement was not properly filed with the comptroller. And there are two ways that a filed agreement can be "implemented" – either via registration or by the passage of thirty days after filing. On the facts already pleaded, the City performed its obligations under the arrangement with JobPath for three years – which suggests that it did not consider this to be an "invalid" contract. All of this fact-based information remains to be explored.

So – the motion to dismiss Count One, for breach of contact against the City, is granted but without prejudice to the filing of a new Count One predicated on a plausible theory of contract formation. If the Plaintiff files such a claim this court will not dismiss it on motion.

### b. The City's Motion to Dismiss Count II – Quantum Meruit – is Denied

The City's motion to dismiss Plaintiff's unjust enrichment claim is denied.

The Plaintiff's unjust enrichment claim against the City is as follows: after wrongfully terminating the contract between us, the City continued to use JobPath's proprietary software (despite having indicated that it would not do so) but did not pay JobPath anything for it. Obviously, if there was a contract and it was wrongfully terminated, then the plaintiff's remedy lies in breach of contract, not unjust enrichment. A plaintiff may not recover in quasi-contract where the parties have a valid, enforceable contract that governs the same subject matter as the claim for quantum meruit. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)).

However, on the facts pleaded, the City appears to be contending (though it is not entirely clear) that it did not enter into a contract with JobPath; rather it entered into a contract with

CDW-G. If in fact there is no contract between the City and JobPath, but the Plaintiff provided

the City with proprietary software that it used to pay for but is now using for free, then of course

JobPath has a claim in unjust enrichment. Because breach of contract and unjust enrichment are

frequently pleaded in the alternative, it would be inappropriate to dismiss the unjust enrichment

claim prior to a finding that there is in fact a contract between JobPath and the City. The Court

may permit plaintiffs to plead a quasi-contractual cause of action "in addition to a breach of

contract claim where there is a dispute over the existence, scope, or enforceability on the putative

contract." *CUnet, LLC v. Quad Partners, LLC*, 2017 WL 945937 at *7 (S.D.N.Y. March 7,

2017).

### c. The City's Motion to Dismiss Count III – New Jersey Computer Related Offenses Act – is Denied

The City's motion to dismiss Count III, which alleges that it violated the New Jersey

Computer Related Offenses Act ("CROA") is denied.

CROA provides a private cause of action against anyone who, via unauthorized access,

causes damage to a New Jersey resident's computer system or data. N.J.S.A. § 2A:38A-3. To

recover under a CROA violation, a plaintiff must prove that it sustained "damage in business or

property as a result of . . . the purposeful or knowing, and unauthorized accessing or attempt to

access any computer, computer system, or computer network." *Id.* CROA defines "'property' as

including "but is not limited to financial instrument, information, data, and computer software in

either human or readable of computer readable form, copies or originals, and any other tangible

or intangible item of value." N.S.J.A. 2A:38A-1(k).

Plaintiff alleges that the City continues to use the proprietary software after the contract

was purportedly terminated. Compl. ¶ 113. If Plaintiff's only allegation in support of a claim

under the CROA were that the defendant accessed the Plaintiff's information, then the claim

would be "doomed." *P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC.*, 428 F.3d 504, 509 (3d Cir. 2005). But here the complaint alleges, not just access, but *continued use* of the software by the City for two years without payment. Compl. ¶ 113. I do not understand such a claim to be dismissible on motion.

But while the third cause of action states a claim, that does not mean JobPath can recover all the damages it seeks. For example, Plaintiff seeks to recover "costs incurred . . . in investigating the source and manner of the unauthorized access." Compl. ¶ 119. Such costs cannot be recovered under the CROA because, "'Investigative costs' are not 'damage[s] in business or property.'" *Bramshill Invs., LLC v. Pullen*, No 19-18288, 2020 WL 4581827, at *5 (D.N.J. Aug. 10, 2020); *see also Spencer Sav. Bank SLA v. McGrover*, No. A-1899-13T3, 2015 WL 966151, at *7 (N.J. Super. App. Div. Mar. 5, 2015) ("The [NJCROA] required proof that a plaintiff was damaged in business or property as a result of the proscribed conduct. [Plaintiff] urges that public policy requires that we interpret this plainly-worded phrase expansively to include [its] costs of investigation and attorneys' fees as damage to its business. Bedrock principles of statutory construction preclude such an indulgence.").

The City's other argument is that Plaintiff cannot recover the "revenue [it] lost by virtue of veterans accessing [its] jobs database for free versus revenue that would had been generated via paid, authorized access." Compl. ¶ 119. It is true that a Plaintiff cannot plead unspecified amounts of damages "to be proved at trial" consistent with the CROA, because such damages are too conclusory. *Bramshill Invs.*, 2020 WL 4581827, at *5 (D.N.J. 2020) (Plaintiff's statement that it "has been damaged in an amount to be proven at trial" is a conclusory allegation). But here, the complaint alleges a specific amount of damages – namely, that it was entitled to collect

25

$250,000 per year for two years so that veterans, using DVS's web site, could access JobPath's information. That is a specific amount of damage; it survives a motion to dismiss.

### D. The City's Motion to Dismiss Count IV – Federal Computer Fraud and Abuse Act – is Granted Without Prejudice and With Leave to Replead

Unlike the CROA claim, Plaintiff's claim under the Computer Fraud & Abuse Act ("CFAA") falls short – even though "[C]ourts seem to have interpreted the [CROA] in harmony with its federal counterpart[, the CFAA]. *In re Nickelodeon*, 827 F.3d 262, 278 (3d Cir. 2016). This is because the federal statute is drafted more narrowly than its state counterpart.

A violation of the CFAA occurs when an individual "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage." 18 U.S.C. § 1030(a)(5)(B).

The CFAA only permits recovery for two defined categories of harm—"damage" and "loss." 18 U.S.C. § 1030(g). "The term 'damage' means any impairment to the integrity or availability of data, a program, as system, or information." 18 U.S.C. § 1030(e)(8). "Loss" is defined as, "(1) any reasonable cost to any victim, including the cost of responding to an offense . . . and (2) any revenue lost . . . because of interruption of service." *Id.* § 1030(e)(11).

Plaintiff fails to plead that it suffered any "damages" that can be recovered under the CFAA. JobPath does not identify any "impairment" to its data as a result of the City's unauthorized access to its computers. Instead, as with its CROA claim, JobPath's theory of recovery rests on investigatory costs and lost revenues. Compl. ¶ 119. Neither suffices.

The "CFAA's loss element can be met by investigative expenses only to the extent that these arise concerning underlying damage to the computer system itself. Out of bounds are costs of . . . identifying the malefactor behind the unauthorized access." *Socialedge, Inc. v. Traackr, Inc.*, 2024 WL 1533624, at *6 (S.D.N.Y. April 9, 2024); *see also Reis, Inc. v. Spring11 LLC*,

26

2016 WL 5390896, at \*9 (S.D.N.Y. Sept. 26, 2016) ("Courts award costs of . . . repairing the damage, which involves only assessing the damage to the system." (cleaned up)); *Van Buren v. United States*, 593 U.S. 374, 391-392 (2021) (statutory definitions of "damage" and "loss" in CFAA focus specifically on technological harms, and are "ill fitted" to "remediating 'misuse' of sensitive information . . ."). Here, Plaintiff's complaint does not allege that the City's unauthorized access to its computer system caused any underlying damage to its computer system. Ergo, it cannot recover money expended to identify unauthorized users.

Furthermore, the federal statute requires that any compensable lost revenue arise out of an "interruption" of service." *See* 18 U.S.C. § 1030(e)(11); *see also Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559 at 562-563 (2d Cir. 2006) ("Because it is undisputed that no interruption of service occurred in this case, [the plaintiff's] asserted loss of $10 million [in lost profits] is not a cognizable claim under the CFAA."). The CROA contains no such limitation on lost revenues.

Here, Plaintiff itself affirms there was no loss of service. Compl. ¶¶ 84 ("multiple agencies of the City of New York continue to use [Plaintiff's] software on a regular basis to this very day"), ¶ 119 (seeking to recover for use of the software and database). JobPath does not plead any facts tending to show that the City's unauthorized access to its software caused any service interruption.

Therefore, the Complaint presently fails to plead facts that could plausibly lead to recovery under the CFAA. The motion to dismiss Count IV is granted, but without prejudice to amendment.

### d. The City's Motion to Dismiss Count V – Copyright Infringement – is Granted Without Prejudice and With Leave to Replead

Plaintiff's last claim against the City is for copyright infringement. The motion to dismiss that claim is granted, but again without prejudice.

There are two elements to a copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). When alleging a copyright infringement claim, "Rule 8 of the Federal Rules of Civil Procedure 'requires that the alleged infringing acts be stated with some specificity." *Kelly v. L.L. Cool J.*, 145 F.R.D., at 36 n.3. (S.D.N.Y. 1992), aff'd 23 F.3d 398 (2d Cir. 1994).

It is a precondition to bringing suit for copyright infringement that the Plaintiff not only have a copyright, but that the copyright be registered with the Register of Copyright prior to the commencement of the lawsuit. *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992) ("The Copyright Act makes a certificate of registration from the U.S. Register of Copyrights *prima facie* evidence of the valid ownership of a copyright."); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 125 (2d Cir. 2014) (noting "copyright registration as a precondition to instituting an infringement action."). The complaint alleges that Plaintiff owns "valid copyrights" in its proprietary software, but it does not allege that the copyright was registered prior to the commencement of the lawsuit. Compl. ¶ 122. In its motion to dismiss the City argues that the complaint is deficient for failing to allege registration. *L.L. Cool J.*, 145 F.R.D. at 36. The City is correct; the motion to dismiss is granted.

Moreover, the City is correct that the copyright infringement claim is deficient because the complaint fails to allege how the copyrighted work was "copied."

Copyright is infringed by copying a work in some specific manner – not simply by accessing or using a copyrighted work. To satisfy this, the complaint must "contain some factual allegations to narrow the infringing acts beyond broad conclusory statements of infringement." *Hartmann v. Amazon.com, Inc.*, 2021 WL 3683510, at \*5 (S.D.N.Y. Aug. 29, 2021) (quoting *Palmer* Kane, 2013 WL 709276, at \*3 (S.D.N.Y. Feb. 27, 2013)). To allege that a work was copied, "a plaintiff must allege 'both that his work was actually copied and that the portion copies amounts to an improper or unlawful appropriation.'" *Wager v. Littell*, 549 Fed. Appx. 32, 322 (2d Cir. 2014) (quoting *Jorgensen v. Epic/Sony Reocrds*, 351 F.3d 46, 51 (2d Cir. 2003)). "In all suits for copyright infringement, the plaintiff must establish its ownership of a valid copyright word and that the defendant *copied* the copyrighted work." *Cognotec Services, Ltd.v. Morgan Guar. Tust Co. of New York*, 862 F.Supp. 45, 48 (S.D.N.Y. 1994) (emphasis added); *see also Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985); *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1092 (2d Cir. 1977).

The complaint as presently drafted alleges only that the City continues to "use" its proprietary software to match veterans with jobs. *Id.* ¶¶ 21-24, 102-104; *see* https://dvs.yourjobpath.com. This is insufficient to plead "copying" under the rule of the cases discussed above.

For these reasons the City's motion to dismiss Count V must be granted.

However, the motion to dismiss Count V, like the motion to dismiss Counts I and IV, is granted without prejudice to amendment. In its opposition to the motion to dismiss, Plaintiff belatedly attaches the registration certificate for its computer software, TX 8-771-307, which shows an effective date of registration as August 15, 2019. Dkt. No. 44 at 21, Fanous Decl. Ex. G. If this were added to the pleading, Count V would survive one of the City's two challenges to

29

the claim of copyright infringement on a motion to dismiss. The failure to allege how the software was "copied" may be harder to remedy, but Plaintiff should be afforded the opportunity to allege the necessary facts.

### B. CDW-G's Motion to Dismiss is Granted

#### a. CDW-G's Motion to Dismiss Count VI – Breach of Contract – is Granted Without Prejudice and With Leave to Replead

"In order to state a claim of breach of contract, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). As to the first element, "A complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms." *Ebomwonyi v. Sea ShippingLine*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020) (quoting *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16-CV-1099, 2017 WL 1383773, at *7 (S.D.N.Y Apr. 12, 2017).

Here, Plaintiffs fail to plead the existence of any contract between itself and CDW-G.

Plaintiff alleges that it entered into an agreement with CDW-G, pursuant to which JobPath agreed to provide software services to City, with which CDW-G had a Master Agreement. Compl. ¶ 129. This is, obviously, an alternative to its primary theory, which is that it had a contract with New York City. But this allegation is purely conclusory. No facts are pleaded in the text of the Complaint tending to show the existence of any agreement between CDW-G and JobPath. The "agreement" is not identified in the Complaint; the only contracts that are referenced in the Complaint are the unexecuted Licensing Agreement (which, for the reasons discussed above, is not a binding contract) and the Master Agreement between CDW-G and the City. Moreover, Plaintiff argues in opposition to the City's motion to dismiss "that it provided

30

software and services to the City pursuant to *a direct contract between it and the City*," Dkt. No. 44. at 4 (emphasis added), and that CDW-G was a "mere conduit" for payment purposes." *Id.* at 9. While JobPath erroneously identifies its contract with the City as the unexecuted Licensing Agreement – a contention this court has dismissed – there remains the distinct possibility that Plaintiff will be able to replead a viable breach of contract claim against the City, because the facts pleaded tend to establish an alternative contract between it and the City in the person of DVS. And on those facts, CDW-G was indeed just an intermediary – nothing more. And a strange sort of intermediary at that, since the record reveals that Betis, not CDW-G, paid Plaintiff – a fact that admits of an inference that there was no contract between CDW-G and JobPath.

Plaintiff also vociferously insists that the Master Agreement between CDW-G and City "cannot possibly be the contract pursuant to which the City paid JobPath . . ." Dkt. No. 44 at 3. Whether that is true or not, Plaintiff is not a party to the Master Agreement, so that Agreement cannot create a contract between JobPath and CDW-G.

All this to say Plaintiff has not identified any contract between itself and CDW-G, and it had not pleaded facts from which the existence of a contract could be inferred (unlike the facts that suggest the possibility of a contract between Plaintiff and the City). Since the existence of a contract is the sine qua non of a claim for breach of contract, Count VI must be dismissed, albeit without prejudice and with leave to amend.

### b. CDW-G's Motion to Dismiss Count VII – Unjust Enrichment – is Granted

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). "Unjust enrichment is found where

31

one party has been enriched at another party's expense and acceptance and retention of the benefit under the circumstances would be unjust." *In re Chateaugay Corp.*, 198 B.R. 848, 861 (S.D.N.Y. 1996) (citing *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)).

Plaintiff's complaint is devoid of a single fact tending to show that CDW-G was enriched by so much as a dime subsequent to the date on which the City purported to "terminate" the JobPath "purchase order" on December 1, 2023. The complaint alleges that *the City* continues to use JobPath's software without paying for it, Compl. ¶ 81, but does not allege that CDW-G used Plaintiff's software at all – ever. Nor does it contain a single fact about how the City's continued use of the software enriched or benefitted CDW-G. As noted above in n.7, CDW-G was "enriched" by taking a commission off the top of the fee paid by the City to Plaintiff (apparently through Betis, not CDW-G). When the City stopped paying Plaintiff, the only plausible inference is that CDW-G stopped earning any money. So the Complaint does not plausibly plead that CDW-G was enriched by the contract's premature termination. This particular defect cannot be cured by amendment.

### Leave to Amend

Plaintiff requests the opportunity to amend its complaint to cure its technical failings. Those failings were identified in the fulsome discussion that precedes this final page. For the reasons stated therein, JobPath has 21 business days within which to file an amended complaint.

Fed. R. Civ. P. 15(a) states that "[t]he court should freely give leave [to amend] when justice so requires." Under this liberal standard, leave is generally given as long as (1) the party seeking the amendment has not unduly delayed, (2) that party is not acting in bad faith or with a dilatory motive, (3) the opposing party will not be unduly prejudiced by the amendment, and (4) the amendment is not futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Futility is a

determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule12(b)(6) of the Federal Rules of Civil Procedure." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

The above discussion establishes that it would not be futile for Plaintiff to replead Count I to allege a breach of contract. Nor would it necessarily be futile for it to replead Count V; JobPath has already provided the court with proof of the missing copyright registration,[13] and for all I know the City's continued use of JobPath's software (which needs to be alleged with more detail) involves someone's making of a copy of that software. This court does not profess to be an expert in matters of copying of computer software.

While I very much doubt that JobPath can successfully replead Count IV (violation of the CFAA), it can try to do so, but it must identify with specificity how its computer system was damaged by the City's unauthorized access or that there was an interruption in service. If it cannot identify any such damage, repleading would be futile. I will also allow Plaintiff to try to plead a proper alternative to its principal theory by identifying the contract between it and CDW-G. But it cannot successfully replead Count VI without alleging facts that identify such a contract.

The claim against CDW-G for unjust enrichment (Count VII) is dismissed with prejudice; amendment would be futile.

---

[13] JobPath must plead specifically what that registration covers. It says in its pleading that it owns copyright in both software and a jobs data base. I do not know whether the registration certificate referenced in its opposition to the motion to dismiss covers both of those, or whether there is a second registration certificate somewhere. JobPath's lack of precision has contributed no end to the court's difficulty in dealing with these motions; it needs to be precise in every particular when repleading.

## Conclusion

The City's motion to dismiss is granted in part and denied in part; CDW'G's motion to dismiss is granted; leave to amend is granted solely as specified above.

This constitutes the decision and order of the court. It is a written decision.

The Clerk of Court is directed to remove the motions at Dockets # 34 and # 36 from the court's list of open motions.

Dated: October 8, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

34